Matthew A. Brinegar, Esq. (SBN 277517)
THE BRINEGAR LAW FIRM
1901 Harrison Street, 14th Floor
Oakland, CA 94612
Telephone: (415) 735-6856
Facsimile: (415) 529-4276
E-mail:  mbrinegar@brinegarlaw.com

Attorney for Relator/Plaintiff

**FILED**

**Mar 26, 2021**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF CALIFORNIA *ex rel*. GAIL JOSEPH, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>P. GILL OBSTETRICS & GYNECOLOGY MEDICAL GROUP, INC, a California Professional Corporation; PARAMPAL K. GILL, M.D., an individual; JASBIR S. GILL, M.D., an individual<br><br>Defendants. | Case No.:   2:21-cv-0554 KJM AC<br><br>1.  Violations of the Federal False Claims Act, §§ 3729 (a)(1)(a) and (a)(1)(b);<br><br>2.  Violations of the California False Claims Act, Cal. Gov. Code § 12652<br><br>3.  Violations of the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7<br><br>4.  Violations of Labor Code §§ 202-203<br><br>**DEMAND FOR JURY TRIAL** |

**[FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2); CAL. GOV. CODE§ 12652(c)(2)]**

Plaintiffs, the United States of America ("United States") and the State of California, by and through Relator/Plaintiff Gail Joseph, M.D. ("Relator" or "Dr. Joseph" or "Plaintiff"), allege as follows.

I.  **<u>INTRODUCTION</u>**

1.    Relator brings this action on behalf of the United States and the State of California to recover losses sustained by Medi-Cal, a joint federal and state program, along with losses sustained by private insurance companies, as a result of Defendants' fraudulent billing practices.

2.    Defendants have perpetrated a fraud on the taxpayers and private insurance companies by falsifying records in order to bill for medical services performed by at least one non-credentialed physician, or by billing for services performed by a credentialed physician under the name of another credentialed physician. Medi-Cal and private insurers prohibit providers from billing for services rendered by non-credentialed physicians or billing services rendered by one credentialed physician under the name of another credentialed physician. Therefore, neither Medi-Cal nor private insurers would have paid these claims if they had been submitted using the real identity of the non-credentialed provider or if payer knew that the claims were submitted under the name of the wrong credentialed provider.

3.    Relator, who performed the services in question, discovered these false claims when they wrote a letter to Defendants regarding obtaining proper compensation for their work. They were told on October 2, 2020, in writing, by Defendants' agent that "**due to your pending credentialing status with some of the payers in the beginning, your claims may have been processed under one of the Group's contracted provider. This is to ensure payments are received for services you have rendered to Gill OB/GYN patients**" (emphasis added) (attached as Exhibit 1). Defendants claim they maintained separate internal books to properly credit Relator for services rendered so that they were compensated in accordance with their employment agreement, but Defendants have never corrected the claims submitted to the government and private insurers. Furthermore, Defendants never returned the ill-gotten money they have received due to their falsified records.

4.     Defendants' practices resulted in numerous violations of the Federal False Claims Act, the California False Claims Act, and Cal. Ins. Code section 1871(A)(l). This is a *qui tam* action to recover treble damages, civil penalties, attorneys' fees, and costs for Relator on behalf of both the United States and the State of California.

5.     The Relator, through investigation and inside knowledge of Defendants' operations, has obtained non-public, direct evidence supporting the allegations in this Complaint. Among other evidence, Relator has obtained and/or compiled based on first-hand information records of medical billing, scheduling, financial records, and other evidence that show the submission of fraudulent medical billing that underlie the scheme at issue.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over the False Claims Act ("FCA") causes of action raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law. This Court also has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732, which confers jurisdiction for claims brought under the FCA on the District Courts of the United States.

7.     Additionally, this Court has supplemental jurisdiction over the other claims in this action pursuant to 31 U.S. Code§ 3732(b), as they arise from the same transaction or occurrence as the federal claims. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as they are so related to the FCA claims in this action that they form part of the same case or controversy.

8.     Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendants transact business in this district, and the fraudulent conduct was committed here.

## III.     PARTIES

9.     Plaintiff in this action is the United States of America and the State of California by and through Relator Dr. Joseph.

10.     Relator Dr. Joseph is a resident of San Joaquin County, California.

11.     Dr. Joseph has direct and independent knowledge of the information on which these allegations are based. From July 18, 2016 until July 15, 2020, they worked as a physician at P. Gill Obstetrics & Gynecology Medical Group, Inc. ("P. Gill Obstetrics"). As a

physician in the Medical Group, Dr. Joseph had access to financial information, provider records, scheduling software, and other documentation of the Defendants' ongoing scheme.

12.   The facts alleged in this Complaint are based entirely upon Relator's personal observation and investigation, as well as documents in their possession.

13.   Defendant P. Gill Obstetrics is a California professional corporation that is located in, and does business in, San Joaquin County, California.

14.   Defendants Parampal K. Gill, M.D. and Jasbir S. Gill, M.D., a married couple, reside in San Joaquin County, California. They are the owners and operators of P. Gill Obstetrics.

## IV.   Statutory Background

### A.   Federal False Claims Act

15.   The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(l)(l)(A)(2009).

16.   The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

17.    As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2009).

18.    The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 6 3729(b)(l)(B) (2009)

19.    On behalf of the United States of America, Relator alleges that, from at least 2016 to 2020, and likely at other times previously and thereafter, Defendants violated the FCA by "knowingly" submitting and/or causing the submission of false claims for payment to Medi-Cal. In addition, Relator alleges, during this same time period, that Defendants knowingly concealed and/or knowingly and improperly avoided obligation to pay or transmit money to the U.S. government by obtaining reimbursement related to their submissions of false claims for payment to Medi-Cal.

**B.**    **The California False Claims Act**

20.    The California False Claims Act provides in pertinent part that a person is liable to the State of California for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Cal. Gov. Code§ 12651(a)(l).

21.    The California False Claims Act defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money, property, or services, and whether or not the state or a political subdivision has title to the money, property, or services that meets either of the following conditions: (A) is presented to an officer, employee, or

agent of the state or of a political subdivision; (B) is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions (i) provides or has provided any portion of the money, property, or service requested or demanded; or (ii) reimburses the contractor, grantee, or other recipient for any portion of the money, property, or service which is requested or demanded." Cal. Gov. Code §1265l(b)(l).

C.      **The California Insurance Frauds Prevention Act**

22.    The California Insurance Frauds Prevention Act ("CIFPA") provides that any person or entity who knowingly submits, or causes the submission of, a false or fraudulent claim to a private insurer in California for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the insurer. Cal. Ins. Code § 1871.7(b). The Court may also grant equitable relief to protect the public.

23.    The CIFPA empowers and encourages any interested person to bring a civil action under Ins. Code § 1871.7 against those who submit, or cause to be submitted, false or fraudulent claims against insurers.

24.    A complaint brought pursuant to §1871.7 is required to be filed *in camera* and under seal for sixty (60) days to allow the government to conduct its own investigation without the knowledge of defendants, and to determine whether to join in the suit. Further, a copy of the complaint and written disclosure of substantially all material evidence shall be served on the District Attorney of the county in which the matter is filed and Insurance Commissioner of the State of California. Relator has complied with these requirements. Simultaneously with the filing of the Complaint in this action, Relator provided written disclosure of substantially all material evidence regarding the allegations contained in the Complaint to the San Joaquin District Attorney's Office and to the office of the Insurance Commissioner of the State of California. Relator also offered complete cooperation in any potential investigation initiated by the above-referenced government entities.

25.   Relator is an original source for all of the information contained in this Complaint as defined by California Insurance Code section 1871.7. Relator has direct and independent knowledge of the information on which the allegations contained herein are based, and they have voluntarily provided this information to the District Attorney and Commissioner.

26.   Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendants knowingly made or caused to be made in connection with their fraudulent scheme.

**D.   The Medi-Cal Program**

27.   Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act. Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C.S. § 1396 et seq.

28.   Each state administers its own Medicaid Program. However, each state program is governed by federal statutes, regulations and guidelines. The federal portion of a state's Medicaid payments-the Federal Medical Assistance Percentage-is based on the state's per capita income compared to the national average.

29.   The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("Provider Agreement"). 42 C.F.R. § 431.107(b).

30.   The California Department of Health Care Services ("DHCS") enacts regulations for California's State Medicaid program, Medi-Cal. As participating Medi-Cal providers, Defendants were and are subject to DHCS regulations.

31.   Defendants, as Medi-Cal providers, are required to complete a Medi-Cal Provider Agreement (DHCS Form 6208).

32.   Among other commitments, as part of the Medi-Cal Provider Agreement, Defendants agreed to, *inter alia,* comply with the laws and regulations, not to engage in fraud and abuse and keep and maintain all necessary records.

**V.   Defendants' Fraudulent Scheme**

33.   From at least July 18, 2016 until July 15, 2020, Defendants perpetrated a fraud on taxpayers and insurance companies by falsifying CMS 1550 forms in order to bill for treatment performed by a non-credentialed physician or under the name of a physician who did not perform the applicable services.

34.   During parts of this time period, as a brand new physician out of residency, Relator was not yet credentialed with a variety of payers. This lack of credentials did not stop Defendants from submitting bills to insurers for Relator's treatment of numerous patients.

35.   In order to collect money for Relator's services, Defendants falsified, or ordered to be falsified, CMS 1500 forms, which are universally required by various private and public payors to seek reimbursement for medical services.

36.   On box 31 of Form 1500, the billing entity must sign either the name of the physician providing the service, or the name of the physician directly supervising the services under the "incident to" rules. By signing Form 1500, the billing entity certifies, *inter alia*, "that: 1) the information on this form is true, accurate, and complete … [and] For services to be considered "incident to" a physician's provisional services 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills."

37.   In each case of fraudulent billing, patients received medical services from Relator. Defendants then submitted a claim for reimbursement for Relator's medical services to various private and public payers using the CMS 1500 form. On box 31 of CMS 1500, Defendants would substitute Relator's name for a provider who was credentialed with the

payer, such as Linda Bouchard, M.D. Relator never provided medical services "incident to" Dr. Bouchard or any other physician affiliated with Defendants.

38.   Defendants and their employee, Tiffany Vang, have been aware of the aforementioned false billing practices and have knowingly permitted such wrongful actions to continue since at least 2016.

39.   On or about August 5, 2020, Relator sent a letter to the Individual Defendants stating, "[s]econdly, across all years of service, 2016 through 2019, I uncovered an alarming number of gynecological surgeries, obstetric deliveries, office visits and office procedures for which claims/insurance billings were incorrectly attributed to other providers, rather than to me as the rendering physician." Said letter is attached hereto as Exhibit 2

40.   An example of this fraudulent billing uncovered by Relator occurred on May 19, 2020 when Defendants submitted a CMS 1500 claim form for $205 with Dr. Bouchard's electronic signature for medical services by Relator provided on January 2, 2019. Said claim was submitted by Defendants to United Health Care and was paid in whole or in part.

41.   Another example of this fraudulent billing occurred on May 20, 2020 when Defendants submitted a CMS 1500 claim form for $135 with Dr. Bouchard's electronic signature for medical services provided by Relator on January 8, 2019. Said claim was submitted by Defendants to TRICARE West and was paid in whole or in part.

42.   Another example of this fraudulent billing occurred on May 18, 2020 when Defendants submitted a CMS 1500 claim form for $1,800 with Dr. Bouchard's electronic signature for medical services provided by Relator on February 6, 2019. Said claim was submitted by Defendants to Medi-Cal and was paid in whole or in part.

43.   An example of this fraudulent billing occurred on May 19, 2020 when Defendants submitted a CMS 1500 claim form for $3,000 with Dr. Bouchard's electronic signature for medical services provided by Relator on May 30, 2019. Said claim was submitted by Defendants to Aetna and was paid in whole or in part.

44.   An example of this fraudulent billing occurred on May 19, 2020 when Defendants submitted a CMS 1500 claim form for $1,089 with Dr. Bouchard's electronic

signature for medical services provided by Relator on July 31, 2019. Said claim was submitted by Defendants to Health Plan of San Joaquin, a Medi-Cal Managed Care Plan and was paid in whole or in part.

45.   An example of this fraudulent billing occurred on May 19, 2020 when Defendants submitted a CMS 1500 claim form for $3,000 with Dr. Bouchard's electronic signature for medical services provided by Relator on June 19, 2019. Said claim was submitted by Defendants to Blue Cross Covered California and was paid in whole or in part.

46.   An example of this fraudulent billing occurred on May 18, 2020 when Defendants submitted a CMS 1500 claim form for $4,800 with Dr. Bouchard's electronic signature for medical services provided by Relator on January 29, 2019. Said claim was submitted by Defendants to Hill Physicians HealthNet Medi-Cal and was paid in whole or in part.

47.   In reply to Relator's August 5, 2020 letter, Defendants' employee, Tiffany Vang, wrote on October 2, 2020 that "due to your pending credentialing status with some of the payers in the beginning, your claims may have been processed under one of the Group's contracted provider. This is to ensure payments are received for services you have rendered to Gill OB/GYN patients"

48.   In Ms. Vang's letter she explained it kept track of who had actually provided the service in its electronic healthcare records system, eClinicalWorks, by including Relator's name in the "Servicing Provider" category for the relevant patient encounters.

49.   These examples of fraudulent billing uncovered by Relator are only a few examples of the widespread fraud perpetrated by Defendants. Relator also uncovered numerous other examples of the same kind of fraudulent billing for services rendered from 2016 through 2020 for gynecological surgeries, obstetric deliveries, office visits and office procedures.

50.   Upon information and belief, Defendants submitted hundreds, if not thousands, of such fraudulent claims in a years-long scheme to defraud governmental entities and private insurers, resulting in at least hundreds of thousands of dollars in ill-gotten gains.

## VI. Defendants' Labor Code Violations

51. Labor Code § 202 requires the payment of all wages "at the time of quitting" if an employee has given at least 72 hours previous notice of their intention to quit.

52. Labor Code § 203 states that if an "employer willfully fails to pay … in accordance with Sections 202, any wages of an employee who … quits, the wages of the employee shall continue as a penalty from the duty date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

53. Dr. Joseph's employment agreement (Exhibit 3) states, in part:

> **Additional Compensation.** Employee shall be entitled to receive additional compensation (in addition to the salary set forth in Section 2.3) based on a percentage of the Net Income actually collected by the Corporation for all professional services rendered by Employee to its patients. The phrase "Net Income" shall mean gross income collected by the Corporation during each of the Corporation's tax years (the periods beginning January 1st and ending December 31st of each year) for professional services rendered to its patients by Employee, less Fifty-five percent (55%) of said gross income which, for purposes of this Agreement, the Corporation and Employee acknowledge and agree is the percentage of said gross income representing and comprising the Corporation's overhead as compared to said gross income. Additional compensation under this Section 2.4 shall be calculated as follows:
>   i. On an annual basis Employee shall be entitled to receive additional compensation under this Section 2.4 according to the following formula: Fifty percent (50%) of the sum determine by subtracting the salary of Employee earned as of December 31st of the year in question, as set forth in Section 2.3, from the Net Income actually collected by the Corporation during the tax year. (Net Income - salary earned for year x .50 = additional compensation).

54. "Proposition 56" provides supplemental payments for eligible physician services to Medi-Cal beneficiaries from July 1, 2017 through December 31, 2021.

55. Dr. Joseph provided said eligible physician services to Medi-Cal beneficiaries from approximately July 1, 2017 until approximately July 15, 2020.

56. Dr. Joseph, additionally, provided at least 72 hours prior notice of the termination of their employment with Defendants on July 15, 2020.

57.   Upon information and belief, Defendants failed to pay Dr. Joseph all of the "additional compensation" due under their contract by failing to credit all collections earned by Dr. Joseph to their "account."

58.   Upon information and belief, Defendants also failed to credit Dr. Joseph with all "Proposition 56" funds that were payable to them for the eligible services that they provided.

## VII.    Causes of Action

### FIRST CAUSE OF ACTION
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**PRESENTING FALSE CLAIMS**

**Against All Defendants**

**(31 U.S.C. § 3729(a)(l)(A))**

59.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

60.   Defendants knowingly caused to be presented false claims for payment or approval to an officer or employee of the United States.

61.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(l)) presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medi-Cal program that were higher than they were permitted to claim or charge by applicable law.

62.   Among other things, Defendants knowingly submitted claims to Medi-Cal under the names of a physician who did not actually provide the services billed for.

63.   Defendants knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

64.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**SECOND CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**MAKING OR USING FALSE RECORDS OR STATEMENTS**
**MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS**

**Against All Defendants**

**(31 U.S.C. § 3729(a)(l)(B))**

65.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

66.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(l)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

67.   Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medi-Cal program.

68.   Among other things, Defendants knowingly submitted false claims for Medi-Cal business.

69.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

//
//
//
//
//
//

**THIRD CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**RETENTION OF PROCEEDS TO WHICH NOT ENTITLED**

**Against All Defendants**

**(31 U.S.C. 3729(A)(l)(G))**

70.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

71.   Defendants knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money property to the United States, or knowingly concealed or knowingly improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

72.   Defendants received far more money from the Medi-Cal program than they were entitled.

73.   Defendants knew that they had received more money than they were entitled to, and they avoided their obligation to return the excess money to the United States.

74.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**FOURTH CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**CONSPIRACY TO COMMIT VIOLATIONS OF THE FALSE CLAIMS ACT**

**Against All Defendants**

**(31 U.S.C. § 3729(a)(l)(C))**

75.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

76.   Defendants conspired with each other to commit the violations alleged in this Complaint, including causes of action one, two, and three inclusive.

77.   Defendants performed acts, including falsifying medical records and submitting fraudulent documentation to effect the object of the conspiracy.

78.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(C) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FIFTH CAUSE OF ACTION
### ON BEHALF OF THE STATE OF CALIFORNIA
### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT PRESENTING FALSE CLAIMS

### Against All Defendants

### (Cal. Gov. Code § 12651, subd. (a)(l))

79.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

80.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of California.

81.   Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

82.   The State of California sustained damages because of Defendants' acts, in amounts to be proved at trial.

## SIXTH CAUSE OF ACTION
### ON BEHALF OF THE STATE OF CALIFORNIA
### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
### MAKING OR USING FALSE RECORDS OR STATEMENTS TO OBTAIN PAYMENT OR APPROVAL OF FALSE CLAIMS

### Against All Defendants

### (Cal. Gov. Code§ 12651, subd. (a)(2))

83.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

84.   Defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims approved by the State of California, in violation of the California False Claims Act.

85.   Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims involving State funds, in violation of the California False Claims Act.

86.   Defendants' false records or statements had the natural tendency to influence, or were capable of influencing, the payment or receipt of money, property, or services.

87.   The State of California sustained damages because of Defendants' acts, in amounts to be proven at trial.

## SEVENTH CAUSE OF ACTION
### ON BEHALF OF THE STATE OF CALIFORNIA
### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT INADVERTENT SUBMISSION OF FALSE CLAIMS
### Against All Defendants
### (Cal. Gov. Code§ 12651, subd. (a)(8))

88.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

89.   Defendants were the beneficiaries of inadvertent submissions of false claims, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California within a reasonable time after discovery of the false claims.

90.   To the extent any of Defendants' complained of acts were inadvertent at the time committed, Defendants subsequently discovered they had engaged in fraudulent billing practices and failed to disclose the facts to the State of California within a reasonable time of such discovery.

91.   Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

92.   The State of California sustained damages because of Defendants' acts, in amounts to be proved at trial.

### EIGHTH CAUSE OF ACTION
**ON BEHALF OF THE STATE OF CALIFORNIA**
**VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT**
**CONSPIRACY**

#### Against All Defendants

#### (Cal. Gov. Code§ 12651, subd. (a)(3)

93.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

94.   Defendants conspired with each other to commit the violations alleged in this Complaint, including causes of action five, six, and seven, inclusive.

95.   Defendants performed acts, including the submission of fraudulent billing information to effect the object of the conspiracy.

96.   The conduct of Defendants violated California Government Code section 12651, subdivision (a)(3) and was a substantial factor in causing the State of California to sustain damages in an amount according to proof.

### NINTH CAUSE OF ACTION
**ON BEHALF OF THE STATE OF CALIFORNIA**
**CALIFORNIA FRAUDS PREVENTION ACT**

#### Against All Defendants

#### Cal. Ins. Code 1871.7; Cal. Pen. Code 550(a)(5)

97.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

98.   This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code§ 1871.7 et seq., as amended ("the Act").

99.   The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery

of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code§ 1871.7(b).

100. Subsection (e) of Cal. Ins. Code§ 1871.7 provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code § 1871.1 (e).

101. Subsection (b) of Cal. Ins. Code§ 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

******

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

*****

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the · statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the

1   amount of any benefit or payment to which the person is entitled. Cal. Penal Code§ 550.

2        102.    By virtue of the acts described in this Complaint, Defendants knowingly

3   presented, or caused to be presented, false records and statements, including but not limited to

4   bills, invoices, requests for reimbursement, and records of services, in order to obtain payment

5   from insurers, in violation of Penal Code§ 550(a) and Cal. Ins. Code§ 1871.7(b).

6        103.    The claims were false or fraudulent because, among other things:

- Defendants knowingly sought, and falsely represented that it was entitled to reimbursement in excess of amounts it was owed;

- Defendants knowingly sought and falsely represented that it was entitled to reimbursement for services not actually performed;

- Defendants knowingly sought, and falsely represented that it was entitled to, reimbursement for treatment that did not meet the required conditions set out by insurers for reimbursement.

        104.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

        105.    This conduct was a substantial factor in causing damages as detailed herein.

        106.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code§ 1871.7. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**TENTH CAUSE OF ACTION**
**ON BEHALF OF DR. JOSEPH ONLY**

**Against All Defendants**

**Labor Code §§ 202, 203**

        107.    Dr. Joseph incorporates herein by reference and realleges the allegations stated in this Complaint.

108.    Defendants, and each of them, violated Labor § 202 by failing to pay Dr. Joseph all of their wages immediately upon termination of employment.

109.    Upon information and belief, Defendants failed to pay Dr. Joseph all of the "additional compensation" due under their employment agreement by failing to credit all collections earned by Relator to their "account."

110.    Upon information and belief, Defendants also failed to credit Dr. Joseph with all "Proposition 56" funds that were payable to them for the eligible services that they provided.

111.    Pursuant to Labor § 203, Dr. Joseph is owed back wages plus an additional 30 days of wages at the "same rate."

112.    At the time of their termination, Dr. Joseph's rate of pay was approximately $767.12 per day plus the "additional compensation" described in their employment agreement.

113.    Therefore, they are entitled to their unpaid wages, and $23,013.70 plus a proportionate share of their expected "additional compensation" as a penalty, together with pre and post-judgment interests, costs and reasonable attorney's fees.

**VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States of America, by and through Relator/Plaintiff and Plaintiff, individually, prays for relief against all Defendants as follows:

**A.  Pursuant to the False Claims Act:**

**TO THE UNITED STATES OF AMERICA AND RELATOR**

(1)    For civil penalties of up to $23,331 to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted to be presented to Medi-Cal for payment;

(2)    For treble damages resulting to the Medi-Cal system from the conduct of Defendants, and each of them;

(3)    For pre and post-judgment interest;

(4)     For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

(5)     That Relator be awarded the maximum percentage of recovery allowed to them pursuant to the False Claims Act.

**B.  Pursuant to the California False Claims Act:**

**TO THE PEOPLE OF CALIFORNIA AND RELATOR:**

(6)     For the maximum allowable civil penalties to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted to presented to Medi-Cal for payment;

(7)     For treble damages resulting to the Medi-Cal system from the conduct of Defendants, and each of them;

(8)     For pre and post-judgment interest;

(9)     For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

(10)    That Relator be awarded the maximum percentage of any recovery allowed to them pursuant to the California False Claims Act.

**C.  Pursuant to the California Insurance Frauds Prevention Act:**

**TO THE PEOPLE OF CALIFORNIA AND RELATOR:**

(11)    For the maximum allowable civil penalties to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted or presented to an insurance company;

(12)    For an assessment of three times the amount of each claim for compensation made by Defendants;

(13)    For pre and post-judgment interest;

(14)    For reasonable attorneys' fees, costs, and expenses incurred in bringing this case;

(15)     For an award of such other and further relief this Court deems just and proper; and

(16)     That the Relator be awarded the maximum percentage of any recovery allowed to them pursuant to Cal. Ins. Code § 1871.7.

**D.  Pursuant to the California Labor Code:**

**<u>TO DR. JOSEPH ONLY:</u>**

(17)   For back wages

(18)   For pre and post-judgment interest;

(19)   For reasonable attorneys' fees, costs, and expenses incurred in bringing this case

(20)   For an accounting;

(21)   For damages pursuant to Labor Code § 203; and

(22)   For an award of such other and further relief this Court deems just and proper.

Dated: May 25, 2021                          THE BRINEGAR LAW FIRM

Matthew A. Brinegar, Esq.
Attorney for Relator
Gail Joseph, M.D.

EXHIBIT 1



999 S. Fairmont Ave., Ste. 230
Lodi, CA 95240
Ph. (209) 334-4924
Fax (209) 334-0127

10/02/2020

Gail R. Joseph, M.D.
1043 Lavender ST.
Manteca, CA 95337

Dear Dr. Joseph,

I am writing in response to your letter dated 08/05/2020.

As per Section 2.4 of your contract, the "Additional Compensation" is computed by taking your income collected by the Corporation from Jan 1st thru December 31st of each year. This means everything we collected in the calendar year despite the date of service. For example, dates of services provided in December that are paid in January will be a part of your collection for the following year when the payments are received.

The report we provided you is based on this methodology. In addition, the "Visit Count" column on our report represents the corresponding CPT code and the payment that has been applied to it when payment was received. The totals in this column should not be used to match up to your tally of total patient visits because it is not based on DOS. Also, the CPT count will not match up to patient visit count because more than one CPT code may be billed for services rendered to a patient. Hence, these are reasons for the variance between our totals.

For your reference, I am sending you another report attached. This is a detailed payment of your deliveries and surgeries for each year, which includes a DOS column. You will see that in 2016, we received payment for 38 deliveries rendered in 2016. Furthermore, in 2017, we received payment for 16 deliveries rendered in 2016. This means a total 54 deliveries rendered in 2016 have been paid and credited to you, but in different years. Please note that the "Unit Count" on this report does not always represent a delivery. If multiple payments for the same delivery were received in different years, the CPT will be listed in both years but for the same delivery (i.e. Acc#          , DOS          /16, insurance paid the delivery in 2016 and patient made a payment in 2017). I have highlighted this on the report. This detailed report will also help you reconcile against your own tracking list of your deliveries and surgeries. If you find that any were missed, please kindly send me the name, DOS, and services rendered so that I can further research them.

In regards to your second concern, please be informed that due to your pending credentialing status with some of the payers in the beginning, your claims may have been processed under one of the Group's contracted provider. This is to ensure payments are received for services you have rendered to Gill OB/GYN patients. Our EMR does appropriately record you as the "Servicing Provider" for each of these claims and the payments are correctly credited to you. Regarding the example claim you provided, the billing department did not update the mapping for this payer correctly, but please be advised that the payment has been credited to you. I have highlighted this payment on your collection report for your reference enclosed.

In regards to your final concern, the State of California Proposition 56 supplemental payments are only available through Managed Medi-cal plans (i.e. Health Plan of San Joaquin) and not for all payers. This means your estimates for 2019 are incorrect, as it pertains to all insurances. The Health Plan of San Joaquin Prop 56 supplemental payments for E&M services totaling $14,793.00 received in 2019 have been correctly credited to you. This is not based on estimates, but actual payments received from HPSJ. Please be informed that any payments received in 2020 for services rendered in 2019 will be included in your 2020 Productivity Report.

The Health Plan of San Joaquin Prop 56 supplemental payments for Family Planning professional services for 07/01/19 – 12/31/19 were received in 2020 and will be included in your 2020 Productivity Report. In regards to the devices, it is not included in the additional compensation calculations. The Additional Compensation is based specifically and expressly on the value of "professional services". It has nothing to do with the costs or profits associated with medical devices. Billing for professional services for any procedure is easily separated and is separated from billing for medical devices as shown by the use of specific CPT codes.

In regards to any losses of any physicians, as per our contract, these losses are absorbed by the Group. Your final productivity report for 2020 will be computed by taking your income collected by the Corporation from Jan 1st, 2020 thru December 31st, 2020 and provided to you after the end of the year.

Please let me know if you have any further questions.

Kind regards,

Tiffany Vang
Controller

EXHIBIT 2

August 5th, 2020

From:   Gail R. Joseph, MD
        1043 Lavender Street
        Manteca, CA 95337

To:     P. Gill Obstetrics and Gynecology Medical Group, Inc.
        999 S. Fairmont Avenue, Suite 225
        Lodi, CA 95240

Re:     Productivity calculations for Dr. Gail R. Joseph, MD for years 2016 through 2019

Dear Dr. Gill,

I hope that this correspondence finds you well.  Thank you for the recent details you have provided regarding my compensation under the terms of my employment contract with you which spanned July 18th, 2016 to July 15th, 2020. After reviewing the report you provided, I do have quite a few more questions and require further information in order to get a clearer picture of how the revenue calculations were derived and how my productivity was tracked and attributed to my billing.

Upon deciding not to renew my contract with the group, I performed a more detailed contract review and noted that under Section 2.4 titled "Additional Compensation," I should have been receiving annual bonuses based on a specific formula.  I have included the relevant section from my contract here for your review.

**2.4** **Additional Compensation.**  Employee shall be entitled to receive additional compensation (in addition to the salary set forth in Section 2.3) based on a percentage of the Net Income actually collected by the Corporation for all professional services rendered by Employee to its patients.  The phrase "Net Income" shall mean gross income collected by the Corporation during each of the Corporation's tax years (the periods beginning January 1st and ending December 31st of each year) for professional services rendered to its patients by Employee, less Fifty-five percent (55%) of said gross income which, for purposes of this Agreement, the Corporation and Employee acknowledge and agree is the percentage of said gross income representing and comprising the Corporation's overhead as compared to said gross income.  Additional compensation under this Section 2.4 shall be calculated as follows:

a.      On an annual basis Employee shall be entitled to receive additional compensation under this Section 2.4 according to the following formula: Fifty percent (50%) of the sum determined by subtracting the salary of Employee earned as of December 31st of the year in question, as set forth in Section 2.3, from the Net Income actually collected by the Corporation during the tax year. (Net Income - salary earned for year  x .50 = additional compensation).

While I did in fact receive a check from the company every Christmas, it was always in amounts ranging from $180 to just over $200.  And upon taking a closer look at my contract, and taking into consideration how busy I was as a provider for your group, it seems that these values are woefully incorrect if they

were intended as the above referenced bonus as opposed to gifts.  Further, upon reviewing the productivity reports you supplied at my behest via Tiffany Vang, my concern deepened.

Your reporting regarding my productivity while I worked for the practice indicates that across the years of my employment with the medical group, there were significant financial losses incurred by the group which worsened each subsequent year, despite the fact that the number of patient visits and procedures I performed increased each year. This is inconsistent with the data I gleaned upon conducting my own research.  And further, I cannot imagine how, from the business perspective, such major losses would have gone unchecked and not have been addressed with me expediently.

There were several areas where errors were obvious.  First, there are discrepancies noted between the number of patient visits attributed to my work that were reported on the EMR reports that you provided, as compared with reports that I pulled from eClinical Works and the hospital medical records department.  Over the years, I have been diligent about tracking my procedures, surgeries and deliveries and when I compared my totals to the totals you provided, the numbers did not add up correctly.

|  | Per my Records 2016 (Jul to Dec) | Per EMR | Per my Records 2017 | Per EMR | Per my Records 2018 | Per EMR | Per my Records 2019 | Per EMR |
|---|---|---|---|---|---|---|---|---|
| **Office Visits** | 1438 | 1412 | 3806 | 3462 | 4175 | 3790 | 4060 | 3709 |
| **Surgeries:** |  |  |  |  |  |  |  |  |
| **Inpatient** | 15 | 3 | 35 | 13 | 39 | 13 | 50 | 16 |
| **Outpatient** | 17 | 19 | 45 | 41 | 39 | 41 | 45 | 55 |
| **Vaginal Deliveries** | 55 | 47 | 118 | 98 | 150 | 128 | 129 | 119 |

As noted above, for each year, I generally had more Office Visits, Surgeries and Deliveries than the patient count reported in the EMR production reports that you provided.  Clearly, these discrepancies also skewed my productivity results to make it appear that I was not entitled to the additional compensation as calculated by the formula outlined in my contract.

Secondly, across all years of service, 2016 through 2019, I uncovered an alarming number of gynecological surgeries, obstetric deliveries, office visits and office procedures for which claims/insurance billings were incorrectly attributed to other providers, rather than to me as the rendering physician.  It goes without saying that if the reimbursement for services rendered by me is not being credited to me, then my productivity values will be lower.  Attached to this correspondence is an example of one such claim/billing report showing the wrong rendering provider.  In this case, the provider shown did not even assist in the surgery.

Finally, I have also attached an example of the State of California Proposition 56 reimbursement calculations attributable to the services I provided.  The example shown is for the year 2019 and includes a half year estimate for family planning services and a full year estimate for other renderings. The report you provided via Tiffany Vang seemed to only partially include Prop 56 reimbursements attributable to my productivity.  Here again is a potential cause for the apparently low productivity calculations.

I am therefore writing to ask that you once again conduct a thorough review of my productivity for the duration of my employment with your organization, and that the results be declared to me in writing.  Thank you kindly for your timely attention to these matters and I look forward to receiving your response by August 20th, 2020.

Kindest Regards,


Gail R. Joseph, MD

EXHIBIT 3

# EMPLOYMENT AGREEMENT

## GAIL R. JOSEPH, M.D.

THIS AGREEMENT is entered into as of May 11, 2015, between P. Gill Obstetrics & Gynecology Medical Group, Inc., a California professional corporation, ("the Corporation") and Gail R. Joseph, M.D. ("Employee").

## RECITALS:

WHEREAS, the Corporation is a California professional corporation rendering professional medical services in obstetrics and gynecology (sometimes "OB/GYN") through its physicians who are duly licensed to practice medicine in the State of California; and,

WHEREAS, Employee (i) is a physician who is licensed or on the Effective Date of Employment under this Agreement, as defined below, will be licensed by the Medical Board of California; (ii) is board certified or board eligible in obstetrics and gynecology by the American Board of Obstetrics and Gynecology; (iii) has, or on the Effective date of Employment, will have active medical privileges at Doctor's Hospital in Manteca, California and courtesy privileges at St. Joseph's Medical Center located in Stockton, California; (iv) will, if not already, become board certified in obstetrics and gynecology by the American Board of Obstetrics and Gynecology at her earliest ability to do so during the term of this agreement; and,

WHEREAS, the Corporation desires to employ Employee upon the terms and conditions set forth below, and Employee desires to accept such employment,

NOW, THEREFORE, for valuable consideration, the receipt of which is hereby acknowledged, the Corporation and Employee agree as follows:

**Section 1.** **Employment Agreement.** The Corporation hereby employs Employee and Employee accepts employment with the Corporation, as of the Effective Date of Employment under this Agreement, to commence rendering medical services as an obstetrician/gynecologist to the Corporation's patients as directed by the Board of Directors of the Corporation or its designee (collectively "the Board") and the applicable rules of professional ethics, as from time to time amended. The "Effective Date of Employment" shall be the date Employee is duly licensed by the Medical Board of California and first reports to the Corporation to perform her duties under this Agreement.   The Effective Date of Employment shall be entered in the Corporation's records and shall be deemed a part of and incorporated into this Agreement. For purposes herein, the Employee agrees that the Effective Date of Employment, i.e. the effective date for commencement of medical services pursuant to this Agreement, shall be **July 15, 2015**, unless the Corporation and Employee mutually

initials   initials

agree to an earlier Effective Date of Employment in writing.  Employee hereby represents, warrants and agrees that during the Term of her Agreement, she shall (i) maintain current and active licensure in good standing with the Medical Board of California and with all other regulatory authorities; (ii) maintain current certification in obstetrics and gynecology with the American Board of Obstetrics & Gynecology; (iii) maintain medical staff privileges in good standing at Doctor's Hospital in Manteca, California, and courtesy privileges at St. Joseph's Medical Center in Stockton, California; and (iv) meet any other requirements necessary to allow Employee to provide a full range of OB/GYN services to the Corporation's patients.

    **1.1**    **General Duties.**  Employee's duties shall include, but not be limited to, rendering medical services in obstetrics and gynecology on an outpatient and inpatient basis; providing "on-call" coverage; keeping and maintaining (or causing to be kept and maintained) appropriate records relating to all professional services rendered by her under this Agreement and preparing and attending to, in connection with such services, all billings, reports, claims and correspondence required by the Board or (subject to the Board's instructions) necessary or appropriate under the circumstances, all of which billings, records, reports, claims and correspondence shall belong to the Corporation.  Employee also shall do all things reasonably necessary or desirable to maintain and improve her professional skills and reputation for the benefit of the Corporation and its patients.  Employee shall be available to perform Employee's duties at the facilities described below, as follows:

        a. Obstetric and gynecological services five (5) full days per week on weekdays.

        b. On-call coverage as necessary. While it is the intent of the parties that ultimately Employee will be on-call not more frequently than 1 in 3 weekdays and 1 in 3 weekends, Employee acknowledges and agrees that staffing may not be sufficient to allow such scheduling, and that Employee may be required to be on-call more frequently than such 1 in 3 days and weekends.

    The above schedule shall be subject to any rescheduling necessary to accommodate patients whose appointments must be changed due to preemption for any reason.  Employee's additional duties and changes in work schedule shall be such as the Board may from time to time direct.

    The Corporation shall take all reasonable steps to cause on-call coverage to be shared by physicians of the Corporation on an equitable and prorata basis.

    **1.2**    **Facilities.**  Employee's primary sites for rendering professional services under this Agreement shall be as directed by the Board at the facilities located in Manteca, California, and any other existing sites or sites which may be acquired by the Corporation in the future.  If Employee's services are needed at sites other than in

2

initials    initials

Manteca or Stockton, Employee and Employer shall mutually agree on the terms of any such assignment prior to said services being required. The Corporation shall make available to Employee or provide Employee with the equipment, support services and supplies suitable to Employee's position and adequate for the performance of Employee's professional duties under this Agreement.

**1.3     Hospital.** Employee, if requested by Corporation, shall execute a Physician Recruitment Agreement with a hospital or hospitals in San Joaquin County.  In the event such Agreement is not executed by Employee as requested, Corporation shall have the right to terminate this Agreement without liability to Employee.

**Section 2.     Compensation.**  Compensation paid to Employee shall be subject to withholding and other applicable employment taxes.  Employee's sole compensation for all services rendered to or for the Corporation during the Term of this Agreement shall be as follows:

**2.1     Signing Bonus.**

a.   Upon signing this Agreement, Employee shall be entitled to receive a one-time payment of Twenty Thousand Dollars ($20,000.00).

b.   The amount set forth in subsection a. above shall be referred to as the "Signing Bonus". The parties acknowledge that the Signing Bonus is being paid with the expectation that the Employee will remain employed by the Corporation for the full Term of this Agreement and if the Employee does not, for any reason whatsoever, whether with or without cause, remain employed by the Corporation for the full Term of this Agreement, then the Employee will be obligated to reimburse the Corporation, on a prorata basis and without interest, the portion of the Signing Bonus which relates to the portion of the Term of the Agreement that was terminated under this Agreement.   For example, if this Agreement is terminated after two (2) years of its Term, then Employee would be responsible to reimburse the Corporation Ten Thousand Dollars ($20,000-$10,000 = $10,000), without interest thereon.

**2.2     Moving Expenses.** Upon the Effective Date of Employment, or earlier date if agreed to in writing by the Corporation, the Corporation shall reimburse Employee for the actual moving expenses incurred and paid by Employee in connection with her employment by Corporation under this Agreement, not to exceed the sum of Ten Thousand Dollars ($10,000).  Moving expenses shall be deemed a business expense pursuant to Section 11 of this Agreement, and underline actual receipts must be provided prior to reimbursement.

initials    initials

**2.3** **Salary.** Subject to the provisions of this Agreement, Employee shall receive an annual salary as follows:

During the first full year of this Agreement, Employee shall receive Two Hundred Fifty Thousand Dollars ($250,000) payable in equal installments on the Corporation's normal payroll dates, but no less frequently than monthly.

During the second full year of this Agreement, Employee shall receive Two Hundred Sixty Thousand Dollars ($260,000) payable in equal installments on the Corporation's normal payroll dates, but no less frequently than monthly.

During the third full year of this Agreement, Employee shall receive Two Hundred Seventy Thousand Dollars ($270,000) payable in equal installments on the Corporation's normal payroll dates, but no less frequently than monthly.

During the fourth full year of this Agreement, Employee shall receive Two Hundred Eighty Thousand Dollars ($280,000) payable in equal installments on the Corporation's normal payroll dates, but no less frequently than monthly.

**2.4** **Additional Compensation.** Employee shall be entitled to receive additional compensation (in addition to the salary set forth in Section 2.3) based on a percentage of the Net Income actually collected by the Corporation for all professional services rendered by Employee to its patients. The phrase "Net Income" shall mean gross income collected by the Corporation during each of the Corporation's tax years (the periods beginning January 1st and ending December 31st of each year) for professional services rendered to its patients by Employee, less Fifty-five percent (55%) of said gross income which, for purposes of this Agreement, the Corporation and Employee acknowledge and agree is the percentage of said gross income representing and comprising the Corporation's overhead as compared to said gross income. Additional compensation under this Section 2.4 shall be calculated as follows:

a. On an annual basis Employee shall be entitled to receive additional compensation under this Section 2.4 according to the following formula: Fifty percent (50%) of the sum determined by subtracting the salary of Employee earned as of December 31st of the year in question, as set forth in Section 2.3, from the Net Income actually collected by the Corporation during the tax year. (Net Income - salary earned for year x .50 = additional compensation).

**2.5** **Benefits.** Employee shall be entitled to participate in such health insurance plans or programs, subject to the qualification and eligibility requirements of those plans or programs, as the Corporation, in its sole discretion, may from time to time provide for its physicians. Employee, at Employee's sole expense, may obtain coverage for Employee's spouse and dependents under said plans or programs, subject to the applicable plan/program qualification and eligibility requirements. Beginning

{00129438.}

4

initials     initials

on the Effective Date of Employment and so long as neither party has terminated or given notice to terminate this Agreement before that date, Employee shall be eligible to participate in the Corporation's pension plan and/or profit sharing plan and/or deferred compensation plan which from time to time, may be made available to the Corporation's physicians, subject to qualification and eligibility requirements of such plan(s).

**2.6    Disallowance of Compensation.**    In the event that any part of the compensation paid or accrued to Employee under Sections 2.1, 2.3 and 2.4 of this Agreement shall be disallowed by the Internal Revenue Service as a deduction of the Corporation under Section 162 of the Internal Revenue Code of 1986 (or shall be disallowed as a deduction for state or local income tax purposes) and such disallowance becomes final, the federal, state and local income tax and interest or other tax "cost" to the Corporation, as the case may be, if any, attributable to such disallowance shall be determined by the Corporation's accountant, together with any additional corporate tax attributable to reimbursement thereunder. The accountant's determination shall be final. Employee hereby agrees that the amount so determined shall be a debt payable on demand without interest by Employee to the Corporation.

**Section 3.    Insurance.**

**3.1    Professional Liability Insurance.**

**3.1.1    Coverage.**    The Corporation shall provide, at its sole cost and expense, professional liability coverage (medical malpractice insurance) for Employee for claims during the Term of this Agreement in connection with actions or services performed within Employee's scope of employment during the Term hereof. Employee agrees to cooperate with the Corporation and shall take all steps necessary to assist the Corporation in obtaining such insurance. Such coverage shall be provided from the date Employee actually begins providing services to the Corporation until Employee ceases providing services to the Corporation.

**3.1.2    Non-Coverage.**    The professional liability coverage provided in Section 3.1.1 herein shall not apply to any services performed by Employee for or on behalf of any other person, entity, or organization. In the event Employee seeks to provide such services, Employee shall provide, at Employee's sole cost and expense or the sole cost and expense of the person, entity or organization for whom Employee is providing services, professional liability coverage in the amounts of not less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) annual aggregate and shall provide evidence of such coverage to the Corporation prior to providing such services. Failure to provide evidence of such coverage shall be material breach

initials          initials

of this Agreement, and upon such breach, the Corporation, at its option, immediately may terminate this Agreement. Nothing stated herein shall relieve Employee of her obligations under Section 1 of this Agreement. Employee agrees that she will hold the Corporation free and harmless from any and all claims, actions, liabilities, costs and expenses, including attorney fees, arising out of any such non-covered services or acts of the Employee.

**3.1.3   Tail Coverage.** Employee agrees to obtain "tail coverage" at Employee's expense upon termination or expiration of the Term of this Agreement in coverage amounts of not less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) annual aggregate with an insurance carrier acceptable to the Corporation and shall provide evidence of such coverage to the Corporation within ten (10) days after termination or expiration of the Term of this Agreement. The Corporation shall be named as an additional insured.

Notwithstanding anything to the contrary, this Section 3.1.3 shall survive the termination of this Agreement.

**3.2    Life Insurance.**   The Corporation may apply for and obtain a key-person insurance policy or policies of insurance on Employee's life in the event the Board determines such insurance is appropriate to protect the Corporation. Such insurance shall be owned by the Corporation and shall be made payable to the Corporation as beneficiary, and the Corporation shall pay all premiums on all such insurance. Employee agrees to cooperate and perform all acts necessary to complete the application for and issuance of such policy or policies. Employee waives any and all right, title, equity or incidents of ownership in such policy or policies, including any rights to premiums paid or the proceeds thereof. Nothing herein, however, shall prohibit the Corporation and/or Employee from acquiring and structuring insurance products for the benefit of the Corporation and/or Employee.

**Section 4.    Loyalty.**   Employee shall devote Employee's full time and best efforts to the performance of Employee's duties under this Agreement. During the Term of Employee's employment under this Agreement, Employee shall not at any time or place or to any extent whatsoever, either directly or indirectly, without the express prior written consent of the Corporation, engage in any other professional practice or activity competitive with or adverse to the business, practice or affairs of the Corporation, whether alone, as a partner, or as an officer, director, Employee, member or shareholder of any other corporation, professional corporation, limited liability company or other practice or entity or as trustee, fiduciary or other representative, except under and pursuant to this Agreement. Employee shall hold the Corporation free and harmless from and all claims, actions, liabilities, expenses, and costs, including attorney fees, as a result of any breach of the provisions herein.

{00129438.}

6

initials       initials

This Section 4 shall not be interpreted to prohibit Employee from making passive personal investments or conducting private business affairs not involving the provision of medical services if those activities do not materially interfere with the services required under this Agreement and are conducted solely during non-business hours; provided, however, that Employee shall not directly or indirectly acquire, hold or retain any interest in any business competing with or similar in nature to the Corporation's business. In addition, this Section 4 shall not be interpreted to prohibit Employee from volunteering Employee's medical services so long as Employee obtains the Corporation's written approval prior to rendering any volunteer medical services, and so long as such volunteer work does not interfere with the services required under this Agreement and are conducted solely during non-business hours. Employee acknowledges and agrees such volunteer work is separate from the Corporation, not within the scope of Employee's employment under this Agreement and shall not be covered under the Corporation's professional liability insurance.

**Section 5.    Trade Secrets, Proprietary Information and Unfair-Competition.** The Corporation and Employee acknowledge and agree that during the Term of this Agreement and in the course of the discharge of Employee's duties under this Agreement, Employee shall have access to and become acquainted with information concerning the operation of the Corporation, including, without limitation, financial, personnel, medical, patient and other information that is owned by the Corporation and regularly used in the operation of the Corporation's business, and that such information constitutes the Corporation's trade secrets and/or proprietary information.

Employee agrees that during the Term, and at all times subsequent thereto, Employee shall not use or appropriate the Corporation's trade secrets or proprietary information nor shall Employee disclose any such trade secrets or proprietary information, directly or indirectly, to any person, except as required in the conduct of the Corporation's business or as authorized in writing by the Corporation.  Employee acknowledges and agrees that the sale or unauthorized use or disclosure of any of the Corporation's trade secrets or proprietary information obtained by Employee during the course of the Corporation's current or any future and proposed work or services, the fact that any such work or services are planned or under consideration, as well as any descriptions thereof, constitute unfair competition.  Unless otherwise expressly set forth herein, the parties hereby agree that the provisions of the Uniform Trade Secrets Act set forth in California Civil Code Section 3426 et seq. are applicable and shall be enforceable under the provisions herein.

Employee promises and agrees that during the Term of this Agreement, Employee shall not directly or indirectly engage in any activity in competition with the Corporation. Employee further promises and agrees that during the Term of this Agreement and at all times thereafter, Employee shall not use the Corporation's trade secrets or proprietary information to compete with the Corporation.

Employee promises and agrees that for a period of three (3) years following the date of the termination or expiration of this Agreement and employment hereunder, Employee shall

{00129438.}

not, either directly or indirectly, (i) solicit any patients seen by Employee while employed by the Corporation or any other patients of the Corporation or (ii) employ any person who is employed by the Corporation within ninety (90) days prior to the date of termination of Employee's employment under this Agreement.

Employee further agrees that all files, records, **including patient records**, documents, drawings, specifications and equipment, voice and video recordings, computer media or software, passwords and keys, image prints including but not limited to marketing plans, client/patient lists, referral lists, and similar items relating to the Corporation's business, whether prepared by Employee or by others, are and shall remain exclusively the property of the Corporation and that they shall NOT be removed from the premises of the Corporation without the express prior written consent of the Corporation.

Employee agrees that damages alone would not be adequate (and difficult if not impossible to determine) and, therefore, the Corporation shall be entitled to injunctive relief without posting of bond, to prevent Employee from breaching the promises and agreements included in this Section 5, and that such an injunction (including temporary restraining orders) may be issued by any court of competent jurisdiction.

**EMPLOYEE ACKNOWLEDGES that the Corporation has not included any non-compete provisions to preclude Employee's practice of medicine in competition with the medical practice conducted by the Corporation. However the Employee recognizes that the Corporation will incur and pay various substantial expenses and costs in connection with the assimilation of Employee into the Corporation. Furthermore the Employee acknowledges that the Corporation will make significant investments to market and build Employees unique skills and medical practice within the San Joaquin County market area, and to build the Employees reputation and services within said market area. Employee understands that the significant investment made by the corporation to build the Employee's reputation, skills and practice within the San Joaquin County market area will continue with the Employee throughout their career. Employee recognizes and agrees that they will take with them the reputation, skills and relationships that they have acquired as a direct result of the substantial investment, expenses and efforts made by the Corporation to build Employee's unique practice within the Corporation's market area. Employee understands and agrees that their skills are unique and difficult to replace and that if the employee were to directly compete with the Corporation in the Corporation's market area within twenty-four (24) months of leaving the Corporation, that the Employee would be putting the Corporation at a severe competitive disadvantage due to the time required for the Corporation to try and replace the Employee's unique skills. Therefore Employee and the Corporation agree that if the Employee, independent of the Corporation, within twenty-four (24) months after his or her separation from employment with the Corporation elects to conduct or participate in a medical practice within San Joaquin County, California, or solicits or accepts patients of the Corporation, for the same type or substantially similar**

{00129438.}

8

initials    initials

medical services rendered by Employee to the Corporation under this Agreement, the Corporation will be damaged and suffer financial loss in an amount which will be difficult, if not impossible to calculate and determine; and, therefore, Employee and the Corporation agree that, in the event of such termination of employment of Employee with the Corporation and conduct of or participation in a medical practice as hereinabove set forth, Employee shall not be precluded therefrom but agrees that, in such event, Employee shall pay the corporation a sum of Two Hundred Forty-Five Thousand Dollars ($245,000), which sum the Employee and the Corporation agree is reasonable in amount and adequately compensates the Corporation for the loss it will suffer.   Employee and the Corporation acknowledge and agree that the provisions herein are not intended to preclude Employee's competition with the Corporation if the Employee is no longer employed by the Corporation; and said provisions have been agreed to in an attempt to mitigate in a contractual manner various damages and financial loss to the Corporation in the circumstances and shall not be construed as precluding or limiting employee's practice of medicine. Employee and the corporation agree that it is their intent that the provisions herein be fully enforceable and acknowledge that the Corporation has relied on the enforceability of these provisions in entering into this Agreement.

Corporate Officer initials                                    Employee initials

The provisions of Section 5 shall expressly survive the termination or expiration of the Term of this Agreement.

**Section 6.**     **Patients and Patient Files**.    Subject to all applicable laws and standards of professional ethics, all files, records, reports, slides, specimens and materials or documents pertaining to the Corporation's patients or professional services rendered by or for the Corporation shall belong to and remain the property of the Corporation and shall NOT be removed from Corporation's offices without prior written consent of the president.

**Section 7.**     **Standards**.  Employee shall perform all duties under this Agreement faithfully, industriously and to the best of Employee's ability, experience and talents and in accordance with such laws, rules and standards of professional ethics and practice as may from time to time be applicable during the Term of this Agreement and Employee's employment under this Agreement.

**Section 8.**     **Paid Time Off**.

**8.1**     **Paid Time Off**.  Upon and from the effective date of this Agreement, Employee shall commence to accrue and shall accrue four (4) work weeks, or 20 days, of paid time off per year which shall include time off for attendance at professional meetings or medical education activities; personal vacation and sick time.  Unused

9

{00129438.}

initials        initials

time off may not be carried-over from year to year.  The timing of any paid time off shall be coordinated in advance with the Corporation's remaining professional physicians and on a minimum of sixty (60) days' notice to the Corporation to ensure that there shall be adequate professional personnel available in order for the Corporation to render proper medical care to its patients.  On termination or expiration of the Term of this Agreement, Employee shall be entitled to be compensated by the Corporation on account of unused accrued paid time off credits, if any.

**8.2    Additional Absences.**  The Board may grant Employee a leave or leaves of absence with or without pay at such time or times and upon such terms and conditions as the Board in its sole discretion may determine.  Additional absences not granted by the Board shall be grounds for pro rata reduction in compensation or for termination of this Agreement, for cause, in the Board's sole discretion.

**Section 9.    Total Disability and Death.**

**9.1    Total Disability Benefit Schedule.**  Should Employee become totally disabled as defined below and be unable to attend to all of Employee's duties under this Agreement, Employee shall be relieved from providing professional services under this Agreement (but not the other requirements thereof, including without limitation, the requirements of Sections 4 and 5 of this Agreement) but shall nonetheless continue to receive a portion of Employee's compensation under this Agreement in accordance with the following schedule during the continuance of such disability and for a period not exceeding three (3) months for each continuous disability:

| Total Disability Benefit Schedule | |
|---|---|
| Days Totally Disabled | Percentage of Compensation |
| 1-30 | 100% |
| 31-90 | 50% |

For purposes of the above, the term "compensation" shall mean Employee's salary as set forth at Section 2.3 of this Agreement.  Health insurance coverage will continue for the first ninety (90) days of disability.  Thereafter, health insurance coverage will continue only at Employee's own expense subject to the qualification and eligibility requirements of the Corporation's health insurer.

**9.2    Disability Period.**  Should such total disability continue for a period in excess

{00129438.}

10

of three (3) months, this Agreement shall, at the end of such three-month period, automatically terminate. If, however, prior to the end of such three-month period Employee's total disability shall have ceased and Employee shall have commenced to fully perform Employee's duties under this Agreement, this Agreement shall continue in full force and effect and Employee shall be entitled to resume Employee's employment under this Agreement and to receive Employee's full compensation from the date full performance recommenced as though Employee had not been disabled; provided, however, unless Employee shall thereafter fully perform Employee's duties under this Agreement for a continuous period of at least one (1) year following a period of total disability from the same or from a different cause, Employee shall not be entitled to start a new three-month period under the Total Disability Benefit Schedule, but instead may continue only under the remaining portion, if any, of the original three-month period for total disability.  In such event, the running of the original three-month period for total disability shall cease during Employee's performance of duties following Employee's original period of total disability before becoming totally disabled again.

**9.3** **Disability Insurance.**  The Corporation, in its sole discretion, may apply for and obtain disability income insurance coverage on Employee in the event the Board determines such insurance is appropriate to protect the Corporation.  Such insurance shall be made payable to the Corporation as beneficiary, or, at the sole discretion of the Corporation, payable to the Employee as beneficiary and the Corporation shall pay all premiums on all such insurance.  Employee agrees to cooperate and perform all acts as necessary to complete the application for and issuance of such policy.  Employee waives any right, title, equity or incidents of ownership in such policy, including rights to premiums paid or the proceeds thereof.  Nothing herein shall prevent the Employee from acquiring disability insurance for Employee's own account or require the Employee to take such action.

**9.4** **Definition of Total Disability.**  The phrase "total disability" shall mean Employee's inability, mental or physical, to perform substantially all of Employee's duties under this Agreement.  That determination shall be made by the Board based on reasonable criteria and after consultation with at least one disinterested physician in an appropriate specialty.  Employee expressly agrees to be examined by said disinterested physician if requested to do so.  The Board shall consider, but is not bound by, the definition of total disability contained in any policy of insurance referred to in Section 9.3 above.

**9.5** **Modified Employment.**  Notwithstanding the foregoing, if the Board, in its sole discretion, determines that Employee, although totally disabled as defined therein, is able to satisfactorily perform some responsibilities for the Corporation, the Board may offer Employee such modified employment terms as the Board in its sole discretion determines, including but not limited to reduced hours, restricted duties, reduced compensation and/or benefits and limited Term, in lieu of some or all of the

11

initials    initials

rights and benefits set forth above. Such modified terms shall be binding only if accepted by Employee in writing as an amendment to this Agreement. Nothing in the section shall be deemed to impose any requirement on the Corporation or Board to consider or to offer any modified employment terms to Employee in the event of Employee's total disability.

**9.6** **Death**. This Agreement shall automatically terminate on the date of death of Employee. Employee or Employee's estate or representative shall be entitled to receive all compensation earned under this Agreement by Employee to the date of death of Employee, which compensation shall be paid by the Corporation as directed herein within thirty (30) days after the date of death.

**Section 10.** **Sexual and Other Unlawful Harassment/Misconduct.** Employee acknowledges that the Corporation is committed to providing an environment that is free of discrimination and unlawful harassment. Unlawful discriminatory or harassing actions, words, jokes, contacts or comments based on an individual's sex, race, ethnicity, age, religion or any other legally protected characteristic will not be tolerated. As an example, sexual harassment (both overt and subtle) is a form of misconduct that is demeaning to another person, undermines the integrity of the Corporation and patient relationship, and is strictly prohibited. Employee agrees to follow all policies, now existing or adopted by the Corporation in the future, relating to sexual and other unlawful harassment/misconduct.

**Section 11.** **Business Expenses.** From time to time, the Corporation may, in its sole discretion, approve and direct payment of reasonable business expenses incurred by Employee in connection with Employee's duties under this Agreement. All requests for reimbursement shall be submitted to the Corporation in writing and in a form sufficient to substantiate a corporate tax deduction therefor. Approved expenses shall be reimbursed within thirty (30) days after the date of approval. Employee agrees to follow all policies, now existing or adopted by the Corporation in the future, relating to reimbursement of reasonable business expenses.

**Section 12.** **Term and Termination.**

**12.1** **Term.** Unless otherwise terminated earlier pursuant to the terms of this Agreement, Employee's employment under this Agreement shall be deemed to commence on the Effective Date of Employment as set forth in Section 1 of this Agreement and shall continue for a period of four (4) years thereafter (the "Term"); provided, however, that this Agreement shall automatically renew for succeeding one-year periods at the end of the original Term unless at least six months written notice of an intent not to renew has been given by Employee to Corporation. For purposes of this Agreement the word "Term", to the extent applicable, shall include any renewed or extended Term of this Agreement.

**12.2** **Termination With or Without Cause.**

{00129438.}

12

initials     initials

a. **Termination by Mutual Agreement or Without Cause.** This Agreement may be terminated at any time by mutual Agreement of the parties in writing or this Agreement may be terminated without cause in the sole discretion of the Corporation by giving Employee ninety (90) days prior written notice of termination. The Corporation may elect to terminate this Agreement and provide Employee with compensation for any applicable period in lieu of notice. Said compensation will be limited to amounts set forth in Sections 2.3 above, if applicable.

**Should Employee elect to terminate this Agreement prior to the expiration of its original term, without the consent of the Corporation, employee may do so in exchange for a lump sum payment to the Corporation as follows:  If Employee terminates the Agreement any time prior to the end of its term Employee shall pay the Corporation the amount of Two Hundred Fifty Thousand Dollars ($250,000.) This payment is an alternative to full performance and not a penalty. (See *Morris v. Redwood Empire Bancorp.* (2005) 128 Cal.App.4th 1305.)**

EMPLOYEE UNDERSTANDS that the Corporation has reasonably relied upon the promises of Employee to commit significant amounts of capital in the building of the Employee's medical practice, and has entered into commitments to third parties for the provision of medical services which are based upon the unique skills possessed by the Employee. In addition, the Corporation, in relying upon the promises of the Employee, has and will continue to make significant investments in marketing and administration services around the Employee's unique skills, training and experience. The Employee further understands that due to the unique and rare background, training and skills of the Employee, the Corporation would not have undertaken these significant expenses if they had believed the Employee were not going to fullfill the full term of this Agreement as said investments were made on the understanding of Employee's commitment to a minimum term.

Employee and the Corporation agree that it is their intent that the provisions herein be fully enforceable and acknowledge that the Corporation has relied on the enforceability of these provisions in entering into this Agreement.

Corporate Officer initials                    Employee initials

b. **Termination For Cause.** The Corporation may, in its sole discretion, terminate this Agreement for cause and Employee's employment relationship at any time without advance notice and with no further

{00129438.}

13

initials    initials

obligation to Employee on the occurrence of any of the following circumstances: (i) Employee's loss, failure to maintain or suspension of licensure to practice medicine in the State of California; (ii) Employee's loss, failure to maintain or suspension of certification in obstetrics and gynecology by the American Board of Obstetrics and Gynecology; (iii) Employee's failure to attain or loss of medical staff privileges at any hospital or medical facility at which the Corporation provides medical services; (iv) Employee's expulsion, suspension or discipline by final action of any hospital professional staff or a duly constituted investigative board thereof for reasons relating to matters of professional competence or moral turpitude; (v) professional liability insurance is not available to Employee for any reason; (vi) Employee's civil conviction for gross negligence or an intentional tort arising out of the provision of professional OB/GYN services; (vii) Employee's conviction of any act which may be charged as a felony misconduct, fraud or abuse pertaining to governmental health care programs or in any way related to the practice of medicine; (viii) Employee engages in sexual or other unlawful harassment/misconduct that is unlawful, disruptive of the Corporation's operations, or in the sole discretion of the Corporation causes undue disharmony among the Corporation's employees and/or patients; (ix) Employee's continued failure to perform Employee's duties under this Agreement, except due to incapacity as a result of physical or mental illness, to the Corporation's reasonable satisfaction after ten (10) days written notice is given to Employee identifying the manner in which Employee has failed to perform Employee's duties; (x) Employee's intentional failure to comply with the Corporation's scheduling and on-call requirements; (xi) Employee during the Term of this Agreement engages directly or indirectly or has direct or indirect interest in any business which competes with the Corporation in any material way; (xii) Employee discloses to any third party, either directly or indirectly, any non-public information regarding the Corporation's business, its patients, financial condition, strategies or operations, the disclosure of which could possible harm the Corporation in a material way; (xiii) Employee commits any fraud, misappropriation, embezzlement, breach of fiduciary duty or other act of dishonesty or crime against the Corporation; (xiv) Employee engages in a behavior considered offensive and against standard character norm and professional ethics which exposes the Corporation to complaints and lawsuits; (xv) Any material breach of any covenants by Employee contained in this Agreement; (xvi) Employee takes a leave of absence without Board approval; or (xvii) the merger, sale, extreme financial hardship, bankruptcy or dissolution of the Corporation.

c. **Termination for Disability or Death.** This Agreement shall automatically be terminated on the basis of disability or death as specified in Section 9.

initials    initials

**12.3   Completion of Performance.**   Notwithstanding the termination of this Agreement or expiration of its Term, the parties shall be required to carry out any provisions of this Agreement which contemplate performance by them subsequent to such termination or expiration, including but not limited to the provisions of Section 5 of this Agreement.  Further, termination or expiration shall not affect any liability or obligation which shall have occurred prior to such termination or expiration, including but not limited to any liability for loss or damage sustained by the non-breaching party on account of a breach of the terms of this Agreement.

**Section 13.   Changes in Law or Ethics.**   If there shall be any changes in the professional corporation laws in any state or federal regulatory laws or rules of professional conduct which infringe on this Agreement, the parties shall cooperate in renegotiating this Agreement, if appropriate, to take such changes into account; provided, however, Employee acknowledges and agrees that Section 5 shall not be subject to material change.

**Section 14.   Miscellaneous.**

**14.1   Integration/Amendment.**   This Agreement fully incorporates the agreements and understandings between the Corporation and Employee relating to this Agreement, and all prior negotiations, drafts and other extrinsic communications between the Corporation, Employee and/or any third party shall have no evidentiary effect whatsoever.  Employee agrees that Employee has read and fully understands the terms of this Agreement, has been represented by counsel in the negotiation and preparation of this Agreement or has been afforded the opportunity to be so represented, this Agreement fully reflects Employee's intentions and parol evidence is not required to interpret the terms of this Agreement.  No amendment to this Agreement shall be effective unless given in writing and signed by Employee and the Corporation.  This Agreement shall not be construed against the Corporation because of the Corporation's involvement in the preparation.

**14.2   Interpretation.**   The terms "Agreement", and "this Agreement" and all references thereto as used therein shall mean this Agreement as originally executed or, if later amended or supplemented, then as so amended or supplemented. The terms "party", "parties" shall refer to the Corporation and Employee and each of them. Descriptive headings in this Agreement are for convenience only and are not to be used to interpret or define the provisions of this Agreement.

**14.3   Gender and Number.**   As used in this Agreement, the masculine, feminine or neuter and the singular or plural number shall be deemed to include the other whenever the context so indicates.

**14.4   Severability.**   If the court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such

15

{00129438.}

initials   initials

findings shall not render that provision invalid or unenforceable as to other persons or circumstances and all provisions of this Agreement in all other respects shall remain valid and enforceable.

**14.5** **No Waiver.** A party's failure to insist on strict compliance with any duty under this Agreement does not constitute a waiver of strict compliance with such duty thereafter or a waiver of any other duty under this Agreement.

**14.6** **Notice.** Any notices required to be given by either party to the other under this Agreement shall be in writing, may be sent by telefacsimile and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or when deposited in the United States mail, first-class postage prepaid, addressed to the party to whom the notice is to be given at the addresses shown below or to such other addresses as either party may designate to the other in writing:

| | |
|---|---|
| To the Corporation: | P. Gill Obstetrics& Gynecology Medical Group, Inc. |
| | P.O. Box 1450 |
| | Lodi, CA 95241 |
| | |
| To Employee: | Gail R. Joseph, M.D. |
| | 1219 Simpson Street |
| | Pensacola, FL 32526 |

**14.7** **Applicable Law.** All rights and obligations under this Agreement shall be governed by and construed in accordance with the laws of the State of California.

**14.8** **Attorneys Fees.** In any action, arbitration or other proceeding brought for the interpretation or enforcement of any of the terms or provisions of this Agreement or because of any alleged dispute, breach, default, or misinterpretation arising out of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in the action, arbitration or proceeding in addition to any damages or other relief to which the party may be entitled and whether or not such action, arbitration or other proceeding proceeds to judgment or award.

**14.9** **Necessary Acts.** Each party to this Agreement agrees to perform any further acts and to execute and deliver any documents which may be reasonably necessary to carry out the provisions of this Agreement.

**14.10** **Survival.** The parties' agreements, representations and warranties made in this Agreement shall survive the execution and delivery of this Agreement. Further, any provision of this Agreement which imposes an obligation after termination of employment shall survive the termination of employment under this Agreement and be binding on the parties.

{00129438.}

16

initials     initials

**14.11   Binding Effect.**  This Agreement shall inure to the benefit of and be binding on Employee and the Corporation and their respective successors, assignees, heirs and representatives.

**14.12   Counterparts.**  This Agreement may be signed in counterparts, all of which shall be deemed on original and binding on the parties.  Proof of signature to this Agreement may be evidenced to the other party by email or facsimile so long as the sending party receives a return confirmation from the other party that he, she or it received the same.

Executed as of May ___9th___, 2015 in Stockton, California, and Pensacola, Florida.

**P. Gill Obstetrics & Gynecology**
**Medical Group, Inc.**

By: _____           _____
      Parampal K. Gill, M.D.                    Gail R. Joseph, M.D.
      President

initials    initials